# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| RYAN OSHUN MOORE,            )<br>                                          )<br>            Petitioner,           )<br>                                          )<br>vs.                                       )<br>                                          )<br>DON HELLING, *et al.*,         )<br>                                          )<br>            Respondents.       )<br>_____/ | 3:05-cv-00348-KJD-VPC<br><br>**ORDER** |

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in which petitioner, a state prisoner, is represented by counsel. The case proceeds on the first amended petition filed by counsel on May 25, 2006. (ECF No. 20.) The case is before the court for resolution on the merits.

**I. Background and Procedural History**

On February 8, 1998, petitioner, Ryan Oshun Moore, and three other individuals undertook to rob, at gunpoint, the occupants of an apartment in the Vista West Apartment complex in Reno, Nevada. During the course of carrying out the armed robbery, one of the four individuals shot and killed a man who they believed was delivering drugs to the apartment. In actuality, the man, Branson Clark, was delivering food. On April 13, 1998, the State of Nevada filed an information in the Second Judicial District Court for the State of Nevada charging petitioner and one of the other individuals, Charles Dejuan Morris, with murder in the first degree with a deadly weapon, robbery with the use of a firearm, and conspiracy to commit robbery with the use of a firearm. (Exhibits to First Am. Pet. Ex. 6, ECF No.

22.)[1]

Following a jury trial, petitioner was found guilty of first-degree murder with use of a deadly weapon, robbery with use of a firearm, and conspiracy to commit robbery with use of a firearm. Petitioner is currently serving two consecutive twenty-to-life terms for first-degree murder with use of a firearm and a concurrent six-to-fifteen year term for robbery. (*Id*. Ex. 61.) Judgment was entered September 24, 1999. (*Id*.)

Petitioner filed a direct appeal from his sentence and conviction. On July 25, 2001, the Nevada Supreme Court issued an opinion reversing in part and remanding in part. (*Id*. Ex. 73.) The Nevada Supreme Court found that it was improper to enhance a sentence for conspiracy using the deadly weapon enhancement. (*Id*.) It remanded the case to the Nevada district court with instructions to vacate the second consecutive twenty-to-life sentence for the count of conspiracy. The Nevada Supreme Court affirmed petitioner's conviction and sentence in all other aspects. (*Id*.) The district court entered a corrected judgment on September 20, 2001. (*Id*. Ex. 77.)

On September 5, 2002, petitioner filed a post-conviction petition in the Nevada district court. (*Id*. Ex. 78.) On October 15, 2004, the district court issued an order dismissing petitioner's petition as untimely pursuant to Nev. Rev. Stat. § 34.726. (*Id*. Ex. 88.) Petitioner appealed, and on May 4, 2005, the Nevada Supreme Court affirmed the denial of his petition. (*Id*. Ex. 100.)

This court received petitioner's federal petition for writ of habeas corpus on June 3, 2005. (ECF Nos. 1, 6.) The court appointed counsel and on May 25, 2006, petitioner filed a first amended petition. (ECF No. 20.) On June 26, 2006, respondents filed a motion to dismiss and an answer. (ECF No. 34.) On March 14, 2007, the court entered an order granting respondents' motion to dismiss and dismissing the amended petition with prejudice as time-barred. (ECF No. 44.)

Petitioner appealed, and on December 23, 2008, the United States Court of Appeals for the Ninth Circuit issued an opinion reversing the order of this court and remanding the case. (ECF No. 57.)

---

[1] The exhibits referenced in this order are found in the court's record at ECF Nos. 21-32 and 87.

Following the remand, on January 13, 2009, this court entered an order in which it noted that, in granting respondents' motion to dismiss on the basis of timeliness, it did not reach respondents' alternative arguments that the claims of ineffective assistance of counsel in ground three are conclusory, unexhausted and/or procedurally defaulted. (ECF No. 61.) The court explained that it would direct respondents to file a new motion to dismiss reasserting their remaining procedural defenses. (*Id.*) The court further explained that once these procedural issues were resolved, the court would direct respondents to file an answer addressing the merits, particularly as to ground two. (*Id.*)

Respondents filed a renewed motion to dismiss on June 8, 2009. (ECF No. 67.) In an order entered June 15, 2009, this court ordered stricken pages 11 through 36 of respondents' renewed motion to dismiss and directed petitioner to respond only to the procedural issues raised in part C through E on pages 37 through 46 of respondents' motion. (ECF No. 68.) Petitioner filed a response in opposition on June 29, 2009 (ECF No. 69), to which respondents filed a reply on July 10, 2009 (ECF No. 70).

On October 29, 2009, the court entered an order granting respondents' renewed motion to dismiss and dismissing ground three with prejudice. (ECF No. 71.) The court further ordered respondents to file an answer to the remaining two grounds for relief. (*Id*.)

Respondents filed an answer to the remaining claims of the amended petition on February 8, 2010. (ECF No. 74.) Petitioner filed a reply on May 14, 2010. (ECF No. 78.) On January 6, 2011, the court issued an order requiring the parties to file supplemental briefs addressing: (1) whether the Nevada Supreme Court erred in rejecting petitioner's *Byford* claim, and if so, whether the error of state law so infected the trial with unfairness as to deny due process of law; and (2) whether petitioner is entitled to relief based on a *Brecht* harmless error analysis. (ECF No. 79.) On March 7, 2011, petitioner filed his supplemental brief and respondents filed their supplemental brief. (ECF Nos. 84, 87.)

## II.  Federal Habeas Corpus Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), at 28 U.S.C. § 2254(d), provides the legal standard for the court's consideration of this habeas petition:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

3

>granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade,* 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000) and citing *Bell v. Cone,* 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade,* 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than merely incorrect or erroneous; the state court's application of clearly established federal law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

In determining whether a state court decision is contrary to, or an unreasonable application of, federal law, this court looks to the state courts' last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by

4

clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**III. Discussion**

    **A. Ground One**

In ground one, petitioner contends that the state district court erroneously denied his motion to suppress statements obtained in violation of his Fifth and Fourteenth Amendment rights. In his motion to suppress, petitioner argued that his waiver of his *Miranda* rights was not knowing, intelligent and voluntary. (Exhibits to First Am. Pet. Ex. 8.) He also argued that his statements given to the police should be suppressed because they were not the product of a rational intellect and free will, largely due to his status as a juvenile. (*Id*.) After hearing testimony on the motion, the state district court made factual findings and denied the motion to suppress. (*Id*. Ex. 13.) The court found, under the totality of the circumstances, that petitioner's statement was given freely, voluntarily, and knowingly. (*Id*.) In addressing this issue on direct appeal, the Nevada Supreme Court held succinctly that, "we have reviewed the record and, in light of the totality of the circumstances, conclude that Moore's confession was voluntary and admissible. See Elvik v. State, 114 Nev. 883, 891-92, 965 P.2d 281, 286-87 (1998) (setting forth the considerations regarding the voluntariness of a juvenile's confession)." (*Id*. Ex. 20 at 6 n.16.)

Part of petitioner's argument regarding his status as a juvenile rests on the parental notification procedures set out in Nev. Rev. Stat. § 62.170, which he claims were violated. The state district court expressly rejected this claim, holding in part as follows:

> It is undisputed that the defendant was 17 years old at the time of the interviews. His mother was not contacted until after he was taken into custody and booked into Wittenberg Hall. She was not told that he was being questioned about his involvement in a murder. NRS 62.170 requires notice to a parent when a juvenile (under 18) has been taken into custody. The testimony during the hearing indicates that this was done. Nothing in the statute requires that notice be given to a parent prior to interviewing a juvenile; nor does the statute require that the parent be told the reasons for the detention of the juvenile.
>
> Moreover, even if the parent had not been notified when the defendant was taken into custody, the remedy for the statutory violation would not be suppression of statements made by that juvenile. [Footnote omitted.] The Motion to Suppress on these grounds is DENIED.

5

(*Id*. Ex. 13 at 2.)  As respondents now argue, compliance with Nev. Rev. Stat. § 62.170 is a state law issue.  Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); *Middleton v. Cupp*, 768 F.2d 1083, 1084-85 (9th Cir.1985).

Petitioner's entire argument in his petition in support of his claim that his Fifth and Fourteenth Amendment rights were violated is that, "any statements made after Moore's comment indicating his unwillingness to talk should have been suppressed.  The trial court erred in denying the motion to suppress in contravention of Moore's Constitutional right to due process and freedom from self-incrimination."  This argument in no way demonstrates that the Nevada Supreme Court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).

In his reply, petitioner argues for the first time that the Nevada Supreme Court's decision is objectively unreasonable in light of the facts.  Following the evidentiary hearing, the state district court found in part as follows:

> The defendant was interviewed in the early evening of February 1998.  While the evidence is conflicting somewhat on whether the defendant called the police or requested someone to call the police, it is clear that the interview took place at his request.
>
> Prior to the interview, when booked into Wittenberg Hall, the defendant had read and signed a "Juvenile *Miranda* Warning."  He was given an opportunity to ask questions about the rights he was waiving.  Prior to the interview with police in the evening of February 14, the detectives ascertained the defendant could read.  He was again given *Miranda* warning, given a written waiver form to sign, and given an opportunity to ask questions concerning the rights.  The defendant signed the waiver form.
>
> The defendant asked numerous questions of the detectives.  These questions demonstrate his clear understanding as to the potential ramifications of his statement; the purpose of the interview; and the seriousness of the situation.
>
> The defense claims that the statement was not voluntary once the defendant said he would not say anything.  On page 18 of the transcript of the tape recordings, the defendant said: "I ain't gonna say motherfuck . . . ., cause

6

> I didn't do . . . ." In argument, the defendant claims that the detectives were obligated to cease all questioning once the defendant made this statement.
>
> Defendant's argument, however, fails when the statement is placed in context of the statements before and after the one cited above. Taken in context, in which the defendant and the detectives were discussing the reason for giving a statement and the ramifications of saying what he knew as a witness or of not making a statement, the comment by the defendant does not indicate an unwillingness to talk. It is apparent from reading the entire transcript and listening to the tapes that the defendant wanted to talk, did not wish to invoke his right not to talk, but that he had concerns about what would happen to him if he did talk. The detectives answered his questions to his satisfaction, never promising him anything for his statement. On page 27 of the transcript, the detectives recap the conversation and the defendant clearly indicates his willingness to talk.
>
> Based on the totality of the circumstances, it is apparent that the defendant's statement to the detectives in the evening of February 14, 1998 was given freely, voluntarily, and knowingly.
> Accordingly, the motion to suppress is DENIED.

(*Id*. Ex. 13.)

As set forth above, the Nevada Supreme Court affirmed this decision, concluding that in light of the totality of the circumstances, petitioner's confession was voluntary and admissible. Petitioner complains that the Nevada Supreme Court did not explain how it came to its conclusion that the statement was voluntary. Petitioner interprets the transcript of the discussion between petitioner and the detectives to show that petitioner clearly stated that he did not wish to talk to them.

Although petitioner has a list of matters that he feels the Nevada Supreme Court should have discussed in its opinion, this does not demonstrate that the decision is legally insufficient. Further, the conversation between petitioner and the detectives focused on petitioner's difficulty in deciding whether to tell the detectives what he knew about the relevant events. This court has reviewed the transcript and agrees with the state district court that petitioner's argument takes his statements out of context. Based on its review of the transcript, this court finds that the Nevada Supreme Court did not make an unreasonable determination of the facts when it concluded that the statement was freely, voluntarily, and knowingly given. This court therefore finds that petitioner has failed to carry his burden on ground one. No basis for habeas corpus relief on that ground exists.

**B. Ground Two**

In ground two, petitioner contends that the district court's jury instruction defining premeditation and deliberation improperly minimized the state's burden of proof, thereby violating his due process rights guaranteed by the Fifth, Sixth and Fourteenth Amendments.

The State charged petitioner with first degree murder under four different theories. (*Id*. Ex. 6.) First, the State alleged that petitioner and his co-defendant, Morris, individually or in joint participation "with malice aforethought, deliberation and premeditation" killed the victim by shooting him multiple times. (*Id*. Ex. 6 at 2.) Second, the State charged that the two co-defendants individually or in joint participation killed the victim during the course of a robbery (felony-murder). (*Id*.) Third, the State alleged that petitioner and his co-defendant aided and abetted the other "with malice aforethought, deliberation, and premeditation" in the killing of the victim by "directly or indirectly encourag[ing] or command[ing] the other to shoot" the victim multiple times. (*Id*.) Finally, the State charged that petitioner and his co-defendant conspired with each other to rob the victim who was killed as a foreseeable consequence of the robbery. (*Id*.; *see also* Ex. 49, Instruction 32.)

At petitioner's trial, the court instructed the jury as follows:

> As it applies in this case, Murder of the First Degree is:
>
> (a) Murder which is any kind of willful, deliberate and premeditated killing; or
>
> (b) Murder which is committed in the perpetration or attempt to perpetrate a robbery (felony murder).
>
> Murder of the Second Degree is all other kinds of murder.

(*Id*. Ex. 49, Instruction 31.)

The court then instructed the jury as to premeditation and deliberation as follows:

> Premeditation is a design - - a determination to kill - - distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly

8

>     the premeditation is followed by the act constituting the killing, it is wilful,
>     (sic) deliberate and premeditated murder.

(*Id*. Ex. 49, Instruction 33.)

At trial, the State presented the separate theories of murder to the jury, arguing during closing argument that petitioner was guilty under all of the theories and that the jury did not have to unanimously agree on which theory supported a guilty verdict. (*Id*. Ex. 48 at 343, 349, 392-93, ECF No. 87.) The jury returned a verdict of guilty on the murder charge. (*Id*. Ex. 51.) The verdict form reflects a finding of guilty for murder in the first degree and that a deadly weapon was used. (*Id*.) The verdict form does not show under which of the State's theories the jury found petitioner guilty. (*Id*.)

As set forth above, petitioner filed a direct appeal from his sentence and conviction. On July 25, 2001, the Nevada Supreme Court issued an opinion reversing in part and remanding in part. (*Id*. Ex. 73.) The Nevada Supreme Court found that it was improper to enhance a sentence for conspiracy using the deadly weapon enhancement. (*Id*.) It remanded the case to the Nevada district court with instructions to vacate the second consecutive twenty-to-life sentence for the count of conspiracy. Additionally, the Nevada Supreme Court rejected petitioner's challenge to the premeditation jury instruction, as follows:

>     Second, the district court did not commit reversible error in giving a
>     "Kazalyn instruction." See Garner v. State, 116 Nev. 770, 788-89, 6 P.3d
>     1013, 1025 (2000) (concluding that our holding in Byford v. State, 116
>     Nev. 215, 994 P.2d 700 (2000), does not apply retroactively).

(*Id*. Ex. 73 at 6 n. 16.) The Nevada Supreme Court affirmed petitioner's conviction and sentence in all other aspects. (*Id*.) The district court entered a corrected judgment on September 20, 2001. (*Id*. Ex. 77.)

The premeditation instruction given in petitioner's trial, at Instruction 33, constitutes what is referred to as a *Kazalyn* instruction. The *Kazalyn* instruction first appeared in Nevada's case law in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992).

After petitioner's trial, but before the entry of the decision in his direct appeal, the Nevada Supreme Court concluded in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000), that the *Kazalyn* instruction erroneously "blur[red] the distinction between first- and second-degree murder" by failing

9

to sufficiently distinguish between the distinct elements of deliberation and premeditation required for a conviction for first-degree murder as opposed to lesser homicide offenses. *Byford*, 116 Nev. at 234-36, 994 P.2d at 713-14. The Nevada Supreme Court approved a jury instruction in lieu of the *Kazalyn* instruction that expressly and specifically distinguished between the three separate elements of willfulness, deliberation, and premeditation. *Id*. The instruction approved in *Byford* carried forward the concept that premeditation "may be as instantaneous as successive thoughts of the mind." *Id*. The *Byford* instruction further stated, however, that "[a] mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill." *Id*. The approved instruction concluded: "A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree." *Byford*, 116 Nev. at 236-37, 994 P.2d at 714-15.

Following the *Byford* decision, the Nevada Supreme Court later held that the giving of a *Kazalyn* instruction does not give rise to a federal due process violation. *Garner v. State*, 116 Nev. 770, 6 P.3d 1013, 1025 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002). The Nevada Supreme Court concluded that the *Byford* holding was not a holding of constitutional dimension that must be retroactively applied. *Id*.

The Ninth Circuit Court of Appeals, however, held that the Nevada Supreme Court's holding in *Garner*, rejecting the federal due process claim, was contrary to clearly established federal law, based entirely upon controlling United States Supreme Court precedent decided prior to petitioner's trial and appeal. *Polk v. Sandoval*, 503 F.3d 903, 909-11 (9th Cir. 2007). "It is clearly established law that, as determined by the [United States] Supreme Court, that a defendant is deprived of due process if a jury instruction 'ha[s] the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind.'" *Polk v. Sandoval*, 503 F.3d at 909-10 (citing and quoting *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *Francis v. Franklin*, 471 U.S. 307, 326 (1985); *In re Winship*, 397 U.S. 358 (1970)). In *Polk*, the Ninth Circuit held that "[the petitioner's] federal constitutional right to due process was violated by use of the *Kazalyn* instruction because it relieved the

1  State of its burden of proving every element of first-degree murder beyond a reasonable doubt." *Polk,*
2  503 F.3d at 909. The court in *Polk* found that "the Nevada Supreme Court erred by conceiving of the
3  *Kazalyn* instruction issue as purely a matter of state law." *Polk*, 503 F.3d at 911. The *Polk* court held
4  that the Nevada Supreme Court erred in concluding that giving a *Kazalyn* instruction in cases predating
5  *Byford* did not constitute a federal constitutional error. *Id.* In reaching its conclusion, the *Polk* court
6  reasoned that "[t]he state court failed to analyze its own observations from *Byford* under the proper lens
7  of *Sandstrom*, *Franklin*, and *Winship*, and thus ignored the law the [United States] Supreme Court
8  clearly established in those decisions – that an instruction omitting an element of the crime and relieving
9  the state of its burden of proof violates the federal Constitution." *Id.* Finally, the Court in *Polk* ruled
10 that where a *Kazalyn* instruction is given, the finding of a due process deprivation is subject to harmless
11 error analysis. *Id.* at 911-12. This court is, of course, bound by the Ninth Circuit's holding in *Polk* that
12 the Nevada Supreme Court's conclusion that there is no federal due process violation is contrary to
13 clearly established federal law as determined by the United States Supreme Court.[2]

14 In the present case, at petitioner's trial, the state district court gave the *Kazalyn* instruction, which
15 included no language precluding a conviction for first-degree murder for a killing committed following
16 "a mere unconsidered and rash impulse." The instruction instead included only the language that
17 premeditation could be "as instantaneous as successive thoughts of the mind." The instruction directed
18 the jury that: "if the jury believes from the evidence that the act constituting the killing has been
19 preceded by and has been the result of premeditation, no matter how rapidly the premeditation is
20 followed by the act constituting the killing, it is willful, deliberate and premeditated murder." (Exhibits
21 to First Am. Pet. Ex. 49, Instruction 33.) Instruction 33 in the instant case violated petitioner's federal
22 due process rights, because it "relieved the State of its burden of proving every element of first degree
23 murder beyond a reasonable doubt." *Polk,* 503 F.3d at 909.

---

[2] This court is aware that the Nevada Supreme Court, in *Nika v. State*, 124 Nev. 1272, 1289, 198 P.3d 839, 850 (2008), expressed its disagreement with the Ninth Circuit's analysis in *Polk v. Sandoval*, 503 F.3d 903, 909-11 (9th Cir. 2007). This court is bound by the Ninth Circuit's *Polk* decision as to the application of a clearly established federal law.

11

1    The trial court's erroneous use of the *Kazalyn* instruction does not end this court's inquiry. As
2 explained in *Polk*, the court must determine whether or not the constitutional error was harmless error.
3 Petitioner will be entitled to relief only if "'the error had a substantial and injurious effect or influence
4 in determining the jury's verdict.'" *Polk v. Sandoval*, 503 F.3d at 911 (quoting *Brecht v. Abrahamson*,
5 507 U.S. 619, 637 (1993)). If the record leaves the reviewing court in "grave doubt" as to whether the
6 error had such an effect, the petitioner is entitled to relief. *Id.*

7    In this case, the court is not convinced that this error was harmless. After petitioner was in
8 custody, he was interviewed by two detectives, John Douglas and Ron Dreher. (Exhibits to First Am. Pet.
9 Ex. 8.) The tape recording of this interview and a transcript of the interview were presented to the jury
10 at trial. (*Id*. Ex. 48 at 263-65.) During the interview, petitioner described his involvement in Clark's
11 death. Petitioner stated that he, "wasn't intending to hurt nobody." (*Id*. Ex. 8 at 14.)[3] Petitioner stated
12 that he purchased the two guns used during the crime at an earlier date for "protection." (*Id*. Ex. 8 at 39.)
13 According to petitioner, Morris, who also goes by the nickname "Cheese," knew that certain residents
14 at the Vista West Apartments possessed approximately $5,000 and five to six pounds of marijuana, and
15 Morris wanted to take it from them. (*Id*. Ex. 8 at 41, 52, 53.) Petitioner stated that he, Morris, and two
16 others planned to wait for someone to enter or exit the apartment so that they could enter the apartment
17 and take the money and drugs. (*Id*. Ex. 8 at 63.) Petitioner admitted that the plan was to rob the
18 occupants of the apartment, and that he participated because he was in "desperate need of money" due
19 to his "family struggling." (*Id*. Ex. 8 at 95.) Petitioner stated that his group brought guns with them
20 because Morris believed the occupants of the apartment had guns. (*Id*. Ex. at 96.) According to
21 petitioner, while his group was waiting for the right time to enter the apartment, Clark entered the
22 apartment carrying two bags. (*Id*. Ex. 8 at 64-65.) At that point, petitioner states that Morris changed
23 the plan and decided that they would rob Clark when he left the apartment. (*Id*. Ex. 8 at 65-66.)
24 Petitioner states that the plan was "not to take him down," but to "take whatever he had." (*Id*. Ex 8 at 66.)

---

26    [3] The transcript of petitioner's interview with Douglas and Dreher is attached to a motion to suppress filed in state district court. The page numbers referenced in this order are found in the bottom right-hand corner of the transcript.

12

1	After Clark left the apartment, petitioner and his group moved to approach him from different
2	directions, with petitioner and Morris both approaching with loaded weapons drawn. (*Id*. Ex. 8 at 67-72.)
3	Petitioner stated that he followed behind Morris in approaching Clark. (*Id*. Ex. 8 at 68.) Before turning
4	a corner in his approach, petitioner stated he saw Morris aiming his gun, and then heard one gun shot
5	followed by several more. (*Id*. Ex. 8 at 72, 86.) As he came around the corner, petitioner stated that he
6	saw Morris getting ready to run, so he started running as well. (*Id*.) Petitioner stated that after he and the
7	other individuals left in their car, he asked Morris what happened. (*Id*. Ex. 8 at 94.) According to
8	petitioner, Morris responded that Clark was in his car and already moving and that the only way to stop
9	him was to shoot. (*Id*.) Petitioner stated that he did not know that Morris was going to shoot Clark and
10	that the plan was to rob the apartment occupants. (*Id*. Ex. 8 at 95.) Petitioner told the detectives that he
11	met with Morris the next day and that Morris told him that shooting Clark "wasn't the game plan." (*Id*.
12	Ex. 8 at 105.) Petitioner stated that he had no intention of killing anybody. (*Id*. Ex. 8 at 109.)
13	No other evidence describing petitioner's involvement with the homicide was presented to the
14	jury. Under current Nevada law, "deliberation" is defined as follows:

15	     Deliberation is the process of determining upon a course of action to kill as
	     a result of thought, including weighing the reasons for and against the
16	     action and considering the consequences of the action.

17	     A deliberate determination may be arrived at in a short period of time. But
	     in all cases the determination must not be formed in passion, or if formed
18	     in passion, it must be carried out after there has been time for the passion
	     to subside and deliberation to occur. A mere unconsidered and rash impulse
19	     is not deliberate, even though it includes the intent to kill.

20	*Byford*, 994 P.2d at 714. Petitioner's statements to Detectives Douglas and Dreher are, at most, scant
21	evidence of deliberation. None of petitioner's statements demonstrate that he engaged in a process of
22	determining upon a course of action to kill—for even a short period of time. Moreover, the state's closing
23	argument regarding petitioner having committed the murder under any of the four theories, including
24	willful, deliberate, and premeditated murder, himself, compounded the *Kazalyn* instructional error.
25	(Exhibits to First Am. Pet. Ex. 48 at 343, 349, 392-93, ECF No. 87.)
26	A second theory of guilt presented to the jury was that petitioner aided and abetted another to

commit premeditated and deliberate murder. None of petitioner's statements, as discussed above, or other evidence shows that petitioner was part of a plan to shoot Clark. Instead, the evidence of petitioner's involvement indicates that he was part of a plan to rob occupants of a Vista West Apartment. The defective *Kazalyn* instruction affects this theory of guilt because this type of murder must have been "premeditated and deliberate."

A third theory of guilt presented to the jury was "premeditated and deliberate murder as a result of conspiracy to commit robbery." (*Id*. Ex. 49, Instruction 32.) For this theory, the jury received the following instructions:

> In this case, a conspiracy is an agreement between two or more persons to commit robbery.
> Mere knowledge or approval of, or acquiescence in, the object or purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one party to a conspiracy, however, a person who knowingly does an act to further the object of a conspiracy is criminally liable as a conspirator.

(*Id*. Ex. 49, Instruction 44.)

> "Knowingly" imports a knowledge that the fact exists which constitute the act or omission of a crime, and does not require knowledge of its unlawfulness. Knowledge of any particular fact may be inferred from the knowledge of such other facts as should put an ordinarily prudent person on inquiry.

(*Id*. Ex. 49, Instruction 45.)

> Formation and existence of a conspiracy can be shown either by way of an express or formal agreement, or it can be shown by inferences drawn from all circumstances tending to show the common intent, and may be proved in the same way as any other fact may be proved – either by direct testimony of the fact or by circumstantial evidence or by both direct and circumstantial evidence.

(*Id*. Ex. 49, Instruction 45.)

> Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if the act or the declaration is in furtherance of the object of the conspiracy.
> Where the purpose of the conspiracy is to commit a dangerous felony, such as robbery, each member runs the risk of having the venture end in homicide, even if it was not intended as part of the original plan or he has forbidden the others to make use of deadly force. Hence, each is guilty of first degree murder if one of them commits homicide in the perpetration of an agreed-upon robbery, even if a member of the conspiracy was not present at the time of the commission of the homicide.

(*Id*. Ex. 49, Instruction 47.)   The defective *Kazalyn* instruction also affects this third theory of guilt because Instruction 32 requires this type of murder to have been "premeditated and deliberate." The jury needed to find that petitioner: (1) agreed with two or more persons to commit a robbery; (2) knowingly acted in furtherance of the robbery; (3) that one of the members of the conspiracy committed a homicide, even if petitioner was not present at the time of the homicide; and (4) that the member of the conspiracy committing the homicide did so with premeditation and deliberation.  Under this theory, the jury needed to find that one of the members of the conspiracy acted with willfulness, deliberation, and premeditation. Thus, the defective *Kazalyn* instruction impacted this theory of guilt as well as the two theories discussed above.

A final theory of guilt presented to the jury was felony murder in furtherance of a robbery.  For this theory, the jury received, in part, the following instructions:

> Whenever death occurs during the perpetration of certain felonies, including robbery, NRS 200.030 defines this as Murder in the First Degree. This is commonly known as the felony murder rule.
> Therefore, an unlawful killing of a human being, whether intentional, unintentional or accidental, which is committed in the perpetration of a robbery is first degree murder if there was in the mind of the perpetrator the specific intent to commit the crime of robbery.
> The specific intent to commit robbery must be proven by the state beyond a reasonable doubt.

(*Id*. Ex.49, Instruction 35.)

> Under the felony-murder rule, a murder is committed in the perpetration of a robbery when it is committed by a defendant while he is engaged in any act required for the full execution of the robbery, including actions taken to gain possession of the victim's property, escape, and/or avoid detection.

(*Id*. Ex. 49, Instruction 36.)  The defective *Kazalyn* instruction does not affect a felony murder theory of guilt because the jury need only find that petitioner had the specific intent to commit robbery and that Clark's death occurred during the perpetration of that robbery.  If the jury made these findings, petitioner could then be found guilty of first-degree murder under the felony-murder rule.

Despite one of the four theories of guilt remaining unaffected by the *Kazalyn* instruction, the jury delivered only a general verdict of first-degree murder.  (*Id*. Ex. 51.) The general verdict form did not

allow the jury to distinguish among the four theories of murder when rendering its verdict. (*Id.*) The jurors were not required to be unanimous in their finding as to any of the four theories of murder. (*Id.* Ex. 49, Instruction 32.) "[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881 (1983); *see also Stromberg v. California*, 283 U.S. 359, 367-68 (1931); *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 778 (11th Cir. 2003) ("An error with regard to one independent basis for the jury's verdict cannot be rendered harmless solely because of the availability of the other independent basis.")

As discussed above, three of the four theories of guilt presented to the jury were affected by the defective *Kazalyn* instruction. Although Instruction 32, and use of a general verdict form, may have helped the jury to reach a verdict, it leaves this court in grave doubt as to whether all jurors agreed that felony murder was the theory by which petitioner was found guilty of first-degree murder. Thus, the jury's first-degree murder verdict must be set aside because it could have rested on a theory of murder impacted by the unconstitutional *Kazalyn* instruction.

In conclusion, the *Kazalyn* instruction given by the state district court in petitioner's trial deprived him of due process of law. The *Kazalyn* instructional error did not constitute harmless error. This court further finds that the Nevada Supreme Court's decision issued July 25, 2001, affirming petitioner's conviction and upholding the use of the *Kazalyn* instruction, was contrary to clearly established United States Supreme Court law. Therefore, this Court will grant a writ of habeas corpus, as further specified below.

**V. Conclusion**

**IT IS THEREFORE ORDERED** that the first amended federal petition for a writ of habeas corpus (ECF No. 20) is conditionally **GRANTED.**

**IT IS FURTHER ORDERED** that petitioner shall be released from custody imposed as a result of his conviction on count one of the information filed in the Second Judicial District Court for the State of Nevada, in State v. Moore, Case No. CR98-0900 within **90 days**, unless the State files a written

election in this matter within the 90-day period to retry petitioner and thereafter commences jury selection in the retrial within **120 days** following the election to retry petitioner.

**IT IS FURTHER ORDERED** that the clerk shall enter judgment in favor of petitioner and against respondents, conditionally granting the petition for a writ of habeas corpus, as described in this order.

**IT IS FURTHER ORDERED** that the clerk is directed to **SEND**, via certified mail, a copy of this order and the judgment to the clerk of the Second Judicial District Court for the State of Nevada in connection with that court's case State v. Moore, No. CR98-0900, the District Attorney of Washoe County, and to the Nevada Supreme Court, in connection with that court's case State v. Moore, No. 34939.

DATED:  March 20, 2012

_____
UNITED STATES DISTRICT JUDGE